# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| YILDIZ DEMIR ÇELIK SANAYI A.Ş. and YILDIZ ENTEGRE AGAÇ SANAYI ve TICARAT A.Ş., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | **Court No. 26-00724** |

## COMPLAINT

Pursuant to Rule 3(a)(2) of the Rules of the United States Court of International Trade, Plaintiffs, Yildiz Demir Çelik Sanayi A.Ş. ("YD") and Yildiz Entegre AGAÇ Sanayi ve Ticarat A.Ş ("YE") (collectively, "YDÇ" or "Plaintiffs"), by and through their counsel, allege and state as follows:

## JURISDICTION

1.      Plaintiffs bring this action pursuant to, and in accordance with, Section 516A(a)(2)(A) of the Tariff Act of 1930, as amended (codified at 19 U.S.C. § 1516a(a)(2)), contesting the final determination issued by the U.S. Department of Commerce ("Commerce") in Certain Corrosion-Resistant Steel Products From the Republic of Türkiye: Final Affirmative Determination of Sales at Less Than Fair Value, 90 Fed. Reg. 42,216 (Dep't Commerce Aug. 29, 2025) ("Final Determination"), and accompanying Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye (Dep't Commerce Aug. 2,

2025) ("Final Decision Memo"), as they apply specifically to Plaintiffs.  The period of Investigation ("POI") is July 1, 2023, through June 30, 2024.

2.     The antidumping duty ("AD") order was issued on December 19, 2025, in Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 90 Fed. Reg. 59,494 (Dec. 19, 2025) ("AD Order").  This Court has jurisdiction over this matter under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2).

## STANDING

3.     Plaintiffs, YDÇ, are foreign producers and/or exporters of subject merchandise and/or were mandatory respondents in the investigation that is contested here.  Plaintiffs therefore are interested parties within the meaning of 19 U.S.C. § 1677(9)(A).  Plaintiffs actively participated in the investigation through submission of factual information and written argument and, thus, are parties to the proceeding as defined in 19 C.F.R. § 351.102(b)(36).  As interested parties that actively participated in the underlying administrative proceeding, Plaintiffs have standing pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS

4.     The AD Order, which is being challenged in this action, was published in the Federal Register on December 19, 2025.  See AD Order, 90 Fed. Reg. at 59,494.  On January 16, 2026, within 30 days after the publication of the subject AD Order, Plaintiffs filed a summons to initiate this action.  See Summons, ECF No. 1, Jan. 16, 2026.  Accordingly, this action is timely filed under 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and Rules 3(a)(2) and 6(a) of the Court.  This Complaint is being filed within 30 days after the date on which the Summons was filed.  Therefore, according to the provisions of 19 U.S.C. § 1516a(a)(2)(A)(i)(II), 28 U.S.C.

§ 2636(c), and Rule 3(a)(2) of the Rules of the U.S. Court of International Trade, this action is timely brought.[1]

## STANDARD OF REVIEW

5. This Court reviews final determinations issued by Commerce pursuant to 19 U.S.C. § 1671(d) to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## PROCEDURAL HISTORY

6. On October 2, 2024, Commerce initiated an AD investigation into whether imports of corrosion-resistant steel products ("CORE") from Türkiye, among other countries, were being sold in the United States for less than fair value ("LTFV"). See <u>Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations</u>, 89 Fed. Reg. 80,195 (Dep't Commerce Oct. 2, 2024) ("<u>Initiation Notice</u>").

7. Following initiation, Commerce selected YDÇ and Borçelik Çelik Sanayii Ticaret A.Ş. as mandatory respondents on the ground that they were the two highest volume Turkish exporters of CORE to the United States during the POI. The two respondents thereafter filed numerous questionnaire responses and supplemental questionnaire responses.

---

[1] Pursuant to Rule 3(a)(2), a civil action is commenced by filing a summons, and within 30 days thereafter a complaint, in an action described in 28 U.S.C. § 1581(c). Pursuant to Rule 6(a)(1)(C), if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday. 30 days from January 16, 2026 was February 15, 2026. February 15, 2026 fell on a Sunday, and Monday, February 16, 2026, was President's Day, a legal holiday. Accordingly, the deadline to file the complaint continued to run until February 17, 2026.

**Court No. 26-00724** **Complaint**

8.     Commerce established the POI as July 1, 2023, through June 30, 2024. *See* Initiation Notice, 89 Fed, Reg. at 81,054.  The POI is the period for which Commerce determined whether and to what extent the Plaintiffs sold subject merchandise at LTFV.

9.     In its Section C response, YDÇ reported duty drawback claimed on certain raw materials on which it was exempt from paying import duties, charges, and value-added tax ("VAT") on condition that finished products are exported.  Letter from Trade Resources Company, re: "Section C Questionnaire Response" (Dec. 13, 2024), at 36 ("YDÇ Sec. C QR").  YDÇ provided screenshots from the Inward Processing Regime ("IPR") portal showing its last 25 certificates.  In its March 24, 2025 supplemental questionnaire response, YDÇ provided copies of all inward processing certificates ("IPC") that were closed.  See Letter from Trade Resources Company, re: "Section C Supplemental Questionnaire Response" (Mar. 24, 2025), at Ex. S4-24 ("YDÇ Supp. C QR").

10.     On March 3, 2025, Commerce issued a supplemental Section D questionnaire to YDÇ in which it requested that YDÇ revise its interest expense ("INTEX") ratio calculation to include a monetary loss or explain why YDÇ believes it is appropriate to exclude the monetary loss.  See Letter to YDÇ, re: "1st Section D Supplemental Questionnaire" (Mar. 3, 2025).  In response, YDÇ explained that it was appropriate to exclude the monetary loss in the INTEX ratio calculation because most items included in the monetary loss relate to long-term fixed assets, capital and prepaid expenses.  Letter from Trade Resources Company, re: "Section D Supplemental Questionnaire Response" (Mar. 24, 2025), at S3-38 to S3-39 ("YDÇ Supp. D QR").  In other words, YDÇ stated that none of the items included in the monetary loss were relevant to short-term financing expenses captured in the INTEX ratio calculation.  Id.  In addition, YDÇ argued that including the monetary loss from the INTEX ratio calculation double-

counted those losses because they are already captured in YDÇ's costs of production. Id. at S3-38.  YDC highlighted that including these losses in INTEX was improper since the monetary loss relates to restatement of differences of all accounts recorded by YDÇ in assets, liabilities, and profits and loss.  Id. at S3-38.  YDÇ explained that Commerce's high inflation margin program already indexed to inflation.  Id.

11. On April 10, 2025, Commerce published its preliminary determination in which it calculated a preliminary weighted-average AD margin of 15.18 percent for YDÇ.  See Certain Corrosion-Resistant Steel Products From the Republic of Türkiye: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures, 90 Fed. Reg. 15,340, 15,341 (Dep't Commerce Apr. 10, 2025) ("Preliminary Determination"), and accompanying "Decision Memorandum for the Preliminary Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye" (Apr. 3, 2025) ("Prelim Decision Memo").  In the preliminary determination, Commerce preliminarily revised YDÇ's reported INTEX ratio to include the net monetary loss recognized on the consolidated financial statements in the numerator.  See Memorandum from James Balog, Senior Accountant, re: "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Yildiz Demir Celik Sanayi A.S. and Yildiz Entegre Agac Sanayi v Ticaret A.S." (Apr. 3, 2025), at 2, Attach. 2 ("YDÇ Prelim Cost Memo").

12. Commerce also preliminarily applied no duty drawback adjustment for YDÇ.  See Prelim Decision Memo at 13.  Commerce claimed that its practice was to only use closed IPCs to calculate a duty drawback adjustment for a respondent.  Id.  Commerce justified its

determination not to grant a duty drawback adjustment to YDÇ because it found that none of YDÇ's IPCs were closed during the POI.  Id.

13.     From May 13 through May 16, 2025, Commerce verified the cost responses of YDÇ.  See Memorandum to The File, re: "Verification of the Cost Response of Yildiz Demir Çelik Sanayi A.Ş. and Yildiz Entegre AGAÇ Sanayi ve Ticarat A.Ş in the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye" (July 9, 2025), at 1.  On July 9, 2025, Commerce issued verification report from the verification of YDÇ's cost responses.  See id.  In its verification report, Commerce observed that YDÇ provided a schedule detailing the items included in the monetary loss in the consolidated financial statements of YE.  Commerce recognized that the schedule provided by YDÇ showed that the total monetary loss included a significant value from accounts that were unrelated to financial income or expenses.  Id. at 14.

14.     On July 17, 2025, YDÇ filed a case brief on cost-related issues in which it argued that Commerce should not have included the monetary loss in the INTEX ratio calculation.  See Letter from Trade Resources Company, re: "YDÇ's Case Brief for Cost Issues" (July 17, 2025), at 9–14 ("YDÇ Cost Case Br.").  First, YDÇ argued that the most items of the monetary loss relate to long-term fixed assets, capital, and prepaid expenses, none of which are relevant to short-term financing calculations.  Id. at 10.  YDÇ also argued that Commerce's high inflation program would double-count the monetary gain since it indexed each monthly cost component to capture the effects of high inflation.  Id. at 10-11.  Second, YDÇ explained that including monetary loss is inconsistent with Commerce's practice of relying on a respondent's normal books and records so long as they are prepared in accordance with generally accepted accounting principles ("GAAP") because YDÇ's accounting statements did not include the monetary

adjustment included by Commerce. Id. at 11. Third, YDÇ argued that it was improper to include the monetary loss because it reflects a non-POI expense that includes the impact of prior years. Id. at 13. Lastly, YDÇ argued that Commerce wrongly included closed IPCs in the cost-side duty drawback adjustment while failing to include the same IPCs in the sales-side adjustment. Id. at 15. YDÇ maintained that Commerce must treat the cost- and sales-side duty drawback adjustment based on the same closed IPCs. Id.

15.    On July 22, 2025, YDÇ filed a case brief on sales-related issues. See Letter from Trade Resources Company, re: "YDÇ's Case Brief for Sales Issues Except Arguments Related to Differential Pricing" (July 22, 2025) ("YDÇ Sales Case Br."). YDÇ argued that it demonstrated that all three IPCs were closed, and that it submitted correspondence from the Government of Türkiye ("GOT") demonstrating that all had been officially validated. Id. at 11 (citing YDÇ Supp. C QR at Ex. S4-24). YDÇ argued that Commerce's practice had been to consistently accept such evidence to demonstrate IPC closure for purposes of granting a duty drawback adjustment. Id. YDÇ contended that Commerce failed to consider evidence that contradicted its determination that YDÇ had not demonstrated that any IPCs had closed in support of its determination not to grant a duty drawback adjustment. Id. at 13. YDÇ urged Commerce to reconsider its preliminary determination not to grant it a duty drawback adjustment because the Federal Circuit has held that a duty drawback adjustment "requires an adjustment to 'export price' based on the full extent of the duty drawback." Id. at 14.

16.    On July 16, 2025, Commerce issued a post-preliminary determination. Memorandum from Kabir Archuletta, Acting Director, Office V, Antidumping and Countervailing Duty Operations, re: "Decision Memorandum for the Post Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Corrosion-

Resistant Steel Products from the Republic of Türkiye" (July 16, 2025), at 2. Commerce changed the differential pricing analysis applied in the preliminary determination by discontinuing its use of the Cohen's *d* test and its use of the "mixed method" (i.e., applying some average-to-average and some average-to-transaction comparisons) as a potential alternative comparison methodology. Id. Instead, Commerce applied its "price difference test to determine whether prices differ significantly among purchasers, regions, or time periods. Id.

17. For comparable merchandise, the "price difference test" examined whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted average net price to all other purchasers, regions, or time periods. Id. Commerce found prices to a given purchaser, region or time period passed the difference test if the weighted-average net price to the given purchaser, region, or time period fell outside of the plus or minus two percent band. Id. Next, Commerce applied the "ratio test," which calculates the ratio of the total value of sales that pass the "price difference" test to the total value of sales by the respondent in the United States during the POI. Id. at 3. If 33 percent of the total value of U.S. sales passed the price difference, then Commerce found that a pattern of price differences existed during the POI. Id.

18. For YDÇ, Commerce preliminarily determined that 49.02 percent of the value of U.S. sales passed the "price difference test. Id. at 4. Therefore, Commerce preliminarily determined there was no meaningful difference between the weighted-average dumping margin calculated using the average-to-transaction ("A-to-T") method. Id. Accordingly, Commerce preliminarily applied the average-to-average ("A-to-A") comparison method to calculate YDÇ's AD margin in the post-preliminary determination. Id. at 5.

Court No. 26-00724                                                                                           Complaint

19.     On August 29, 2025, Commerce Published the Final Determination.  See Final Determination, 90 Fed. Reg. at 42,216.  In the Final Determination, Commerce continued to include the net monetary loss in its calculation of YDÇ's INTEX ratio.  Final Decision Memo at 25.  Commerce concluded it was appropriate to account for the impact of inflation because it conflated YDÇ's application of Turkish GAAP with Turkish Financial Reporting Standards ("TFRS").  Id.  As a result, Commerce continued to conclude that YDÇ's parent company, YE, included the net monetary loss in its financial statements.  Id.

20.     Commerce also found that including the net monetary loss would not double-count inflation in YDÇ's reported costs because Commerce found that its cost methodology did not increases costs for inflation, but rather used indexing to calculate annual weighted-average costs in a constant currency.  Id. at 26.  Lastly, Commerce concluded that the monetary loss was a POI loss because the adjustment represented the current year gain or loss due to inflation on monetary assets while also acknowledging that the loss compares to the prior year's financial statements, which include losses applicable to the prior year.  Id. at 27.

21.     Commerce also refused to calculate a duty drawback adjustment for YDÇ because it claimed that its practice generally limits consideration of duty drawback adjustments to IPCs that closed during the POI.  Id. at 41.  However, Commerce did not consider or address that case law holds that it must provide a duty drawback adjustment based on all closed IPCs even if they had closed after the POI.  Id.  Commerce ignored record evidence showing that YDÇ's IPCs had been approved by the GOT, and declined to grant YDÇ's duty drawback claim because those approvals were not made during the POI.  Id. at 42.  Therefore, Commerce continued to limit its duty drawback adjustment to IPCs closed during the POI based on the rationale that no benefit accrued to the respondent under an IPC until the IPC is closed.  Id.  Commerce concluded that

limiting duty drawback to the actual duty liability extinguished during the POI is consistent with its general practice of collecting allocated expense data covering the POI for sales adjustment purposes. Id. at 43.

22. Finally, in the final determination, Commerce applied the A-to-T method to calculate the weighted-average dumping margin for YDÇ for the first time. See Memorandum to The File, re: "Final Determination Analysis Memorandum for Yildiz Demir Çelik Sanayi A.Ş. and Yildiz Entegre Ağaç Sanayi ve Ticaret A.Ş." (Aug. 25, 2025), at 2 ("YDÇ Final Analysis Memo"). Based on these determinations, Commerce calculated a final weighted-average AD rate for YDÇ of 10.49 percent. See Final Determination, 90 Fed. Reg. at 42,217.

23. On December 19, 2025, Commerce published the AD Order. See AD Order, 90 Fed. Reg. at 59,494.

## ISSUES PRESENTED BY THE ACTION AND PLAINTIFFS' STATEMENT OF CLAIMS

24. In the following respects, and for other reasons apparent from the record of the administrative proceeding, Commerce's Final Determination in its AD investigation are not supported by substantial evidence, and are otherwise not in accordance with law.

## COUNT ONE

25. Paragraphs 1 through 24 are incorporated herein by reference.

26. Commerce unlawfully included the net monetary loss in YDÇ's INTEX ratio calculation. Commerce's determination ignored the fact that net monetary loss is not recognized in YE's profit and loss statement. Moreover, Commerce ignored evidence that the net monetary losses included in the INTEX ratio were non-POI expenses. Commerce also ignored that such monetary losses were mostly composed of long-term non-financing components. Accordingly,

Commerce's inclusion of net monetary losses in YDÇ's INTEX ratio was unsupported by substantial record evidence, and otherwise not in accordance with law.

## COUNT TWO

27. Paragraphs 1 through 26 are incorporated herein by reference.

28. Commerce unlawfully failed to calculate a duty drawback adjustment even though the statute, case law, and its practice requires it to calculate cost-side and sales-side duty drawback adjustments based on the same closed IPCs. Commerce unlawfully denied YDÇ a sales-side adjustment on the grounds that YDÇ had no IPCs that were closed during the POI, but Commerce calculated the cost-side adjustment based on all IPCs YDÇ used during the POI. In other words, Commerce unlawfully based sales-side and cost-side adjustments for duty drawback based on different IPCs. Accordingly, Commerce's determination not to calculate a sales-side duty drawback adjustment was unreasonable, unsupported by substantial record evidence, and otherwise not in accordance with law.

## COUNT THREE

29. Paragraphs 1 through 28 are incorporated herein by reference.

30. Commerce's calculation of YDÇ's AD margin based on the A-to-T comparison by applying its revised differential pricing analysis, including the two-percent difference test, is contrary to law. Commerce does not support how a two percent difference in prices of the comparison group is the best reading of the text of 19 U.S.C. § 1677f-1(d)(1)(B). The Federal Circuit doubted that Commerce could satisfy the statute when (under a different test) it identified prices as differing significantly, even though the prices are "very similar, falling within a relatively small range." See Stupp Corp. v. United States, 5 F.4th 1341, 1359. The two percent "price difference" test cannot amount to the best reading of the statutory text. Accordingly,

Commerce's adoption of the two percent "price difference" test is contrary to the language of 19 U.S.C. § 1677f-1(d)(1)(B).

## DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF

31.    For the reasons stated above, Plaintiffs respectfully request that the Court:

(a)    enter judgment in Plaintiffs' favor;

(b)    declare that with respect to the issues raised in this Complaint, Commerce's determinations and all related findings and conclusions are unsupported by substantial evidence on the record or are otherwise not in accordance with law;

(c)    remand these matters to Commerce for redetermination consistent with the Court's opinion, including a recalculation of the AD margin for YDÇ; and

(d)    provide such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Kenneth N. Hammer
Jonathan M. Freed
Kenneth N. Hammer
Aqmar Rahman

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC  20003
Tel:  (202) 223-3760
khammer@tradepacificlaw.com

Dated:  February 17, 2026                        Counsel for Plaintiffs